1 | Michael St. James, CSB No. 95653
ST. JAMES LAW, P.C.
2 | 155 Montgomery Street, Suite 1004
San Francisco, California 94104
3 | (415) 391-7566 Telephone
(415) 391-7568 Facsimile
4 | michael@stjames-law.com

5

6 | Scott McNutt, CSB
Marianne Dickson, CSB
MCNUTT LAW GROUP, LLP
7 | 188 The Embarcadero, Suite 800
San Francisco, CA 94105
8 | (415) 995-8475 Telephone
(415) 995-8487 Facsimile
9 | mdickson@ml-sf.com

10 | Counsel for Debtor

11

12 | **UNITED STATES BANKRUPTCY COURT**

13 | **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

14 | San Francisco Division

15

16 | In re | Case No. 09-31879 DM

17 | MONTGOMERY REALTY GROUP, INC.. | Chapter 11

18 |

19 | Debtor

20

21 | **DISCLOSURE STATEMENT SUPPLEMENT**

22 | *To Accompany Amended Plan of Reorganization Dated May 10, 2010*

23

24

25

26

27

28

## I.   INTRODUCTION

This Disclosure Statement Supplement serves five purposes.

First, it provides an update on the status of Montgomery Realty Group, Inc.'s efforts to reorganize.  Second, it provides updated information about Montgomery Realty Group Inc.'s income and expenses, the funds that will ultimately be available for distribution to creditors, and the magnitude and scope of the creditor claims that have been filed against the estate.

Third, in response to the issues that have been raised in the pending confirmation litigation, the Debtor has obtained a Loan Commitment to ensure its ability to execute the Plan of Reorganization from its largest shareholder, Dinesh Maniar, in return for a release of all claims against him.  This Supplement presents an explanation of that Loan Commitment and the release. The Debtor will seek an Order approving entering into the Loan Commitment on May 28, 2010, and has incorporated the terms of that Loan Commitment into its Amended Plan of Reorganization.

Fourth, this Disclosure Statement Supplement discusses the terms of a settlement, including modified repayment terms, that has been reached with Berkadia (formerly Capmark), the servicer for the first deed of trust on 710 Sansome Street and one of the two principal opponents to confirmation of the Plan.   The Debtor will seek an Order approving that settlement on May 28, 2010, and has incorporated the terms of that settlement into its Amended Plan of Reorganization.

Finally, this Disclosure Supplement describes certain additional modifications to creditor treatment that have been proposed under the Amended Plan of Reorganization.  The Amended Plan of Reorganization accompanies this Supplement.  After reviewing the Supplement and the Plan, creditors may elect to vote or change their votes by returning the enclosed supplemental ballot.  Unless a new ballot is submitted, the prior votes will be assumed to continue to apply.

## II. CURRENT AND ANTICIPATED STATUS OF PROPERTIES

Consistent with the prior Disclosure Statement, the Debtor has undertaken to transfer the Glen Oaks Apartments in Austin, Texas and has focused its attention on the reorganization of its two San Francisco commercial properties.  In each case, the holder of the first deed of trust objected to the Plan of Reorganization and the parties undertook discovery and preparations for a contested confirmation trial, originally scheduled for April 11 and 12, 2010.  These preparations for trial yielded substantially more extensive and substantive information about the likely future course of these properties than was contained in the prior disclosure statement; sharing that information is one objective of this Supplement. This information is presented separately with respect to each property.

### A. 710 Sansome Street

As noted in the prior disclosure statement, 710 Sansome Street is a single tenant, three story, 22,000 square foot building.  The property has been the headquarters of the Keker & Van Nest law Keker Firm (the "Keker Firm") for more than 20 years.  The Keker Firm is currently paying almost $83,812.50 per month rent, which is substantially in excess of current market rental rates.  The current lease expires at the end of February 2011.  The Keker Firm had an option to extend the lease through November 2012 at even higher rental rates, but allowed that option to expire.

The Keker Firm's managing partner was deposed as part of the Plan litigation.  Based on that deposition, and other investigative efforts, the Debtor has concluded that (1) the Keker Firm will vacate the premises in February 2011, at least unless it is offered a rental rate that approximates current market rates and (2) even if the Keker Firm agrees to extend its tenancy following February 2011, it is overwhelmingly likely to terminate its tenancy and permanently vacate the premises in November 2012.

As a consequence, the Debtor has concluded that it must anticipate incurring the expense of Lease-Up the property in the near future, that is, a broker's commission and a tenant improvement allowance.  Although it is unclear when those expenses will be incurred, that issue is of little likely relevance:  they will likely be incurred either in February 2011 or in November 2012, but in either event it seems overwhelmingly likely that they will be incurred.  The principal difference as a practical matter

is whether the Debtor will enter into a long term lease with a new tenant based on market rental rates in February 2011 or based on market rental rates in November 2012.

The expenses associated with Lease-Up the property will be significant.  The Debtor believes that a broker's commission to Lease-Up 710 Sansome Street is likely to cost between $65,000 and $90,000; in the litigation, Berkadia argued that it would cost $350,000.  The Debtor believes that a tenant improvement allowance will run between $220,000 and $335,000; in the litigation, Berkadia contended that it would cost about $360,000.

The only obvious source of funding for these tenanting expenses is the above-market rent to be paid by the Keker Firm until March of 2011.  The Debtor currently anticipates gross accumulations from those rents, net of debt service (consistent with the Berkadia Stipulation discussed below), will exceed $300,000.  Although the Debtor is optimistic that tenanting expenses will not require all of those funds, in the interest of prudence, and to address the issues respecting 447 Battery Street described below, the Debtor intends to impound all net rents until both properties have been Leased-Up.

### B.      447 Battery Street

East West Bank had provided purchase money financing for the acquisition of 447 Battery Street, and was owed approximately $5.7 million secured by a first deed of trust against the property. Shortly after the bankruptcy case was filed, John Yee, a speculator in commercial real estate, purchased that debt with the objective of foreclosing and owning the property.

Mr. Yee objected to confirmation of the Plan of Reorganization and has prosecuted an objection based principally on the contention that the Plan of Reorganization is not feasible because the Debtor will not be able to tenant the empty space at 447 Battery Street due to tenanting costs and, if tenanted, could not generate sufficient income from the property to fund its operations.

Recently, the Debtor has entered into leases with Magellan Wine, LLC, d/b/a Hidden Vine, for 1,870 square feet on the ground floor and a portion of the basement and has entered into a lease of 1,320 square feet of basement space to the Church of Scientology.  As a consequence, the vacant space to be rented now consists of the entire Third Floor, amounting to 6,188 rentable square feet, and a second floor Suite which the Debtor's affiliate, Diversified Investment Management Corporation, contemplates

renting.  The Debtor is engaged in negotiations with prospective tenants for the third floor, although no letter of intent has been signed.

Giving effect to the foregoing leases, including DIMC's anticipated rental, and projecting a tenant for the third floor at the rental rate proposed by Mr. Yee's expert witness, the 447 Battery Street property generates adequate cash flow, as follows:

| | | |
|---|---|---|
| Revenue (Actual & Estimated) | $ | 51,318 |
| Operating Costs | $ | (8,439) |
| Taxes & Insurance | $ | (7,678) |
| Yee 1st Deed of Trust | $ | (31,949) |
| | | |
| Net Cash Flow | $ | 3,252 |

A second, serious issue raised with respect to the feasibility of the Plan respecting 447 Battery Street relates to tenanting expenses.  In order to lease commercial real property, it is ordinarily necessary to provide the tenant with a "tenant improvement allowance" to assist it in building out the premises to suit its needs, and it is ordinarily necessary to pay a broker's commission.  The magnitude of the tenant improvement allowance is ordinarily a matter of negotiation.  With respect to the Third Floor premises, for example, the Debtor has engaged in negotiations with prospective tenants who would require as little as $13,000 for a tenant improvement allowance; Mr. Yee's experts, on the other hand, have suggested that the tenant improvement allowance would be as much as $155,000.  Mr. Yee's expert asserts that the broker's commission for the Third Floor premises would amount to $70,000.

Although the property appears readily capable of generating ample cash flow to fund operating expenses and debt service, funding tenanting expenses is more problematic.  As of May 1, 2010 there will be approximately $135,000 of cash on hand, an amount that quite possibly will be insufficient fully to tenant the property.  In addition, following confirmation of the Plan of Reorganization, the Debtor will be required to fund debt service to Mr. Yee, which will also consume available cash.

III.    THE LOAN COMMITMENT

The Debtor recognizes that accumulated cash on hand and cash to be received from the Keker Firm's rents until March of 2011 may prove insufficient to fund all necessary tenanting expenses and

debt service.  The Debtor believes that it is possible that funds will prove sufficient, and expects that any shortfall would amount to $350,000 or less.  On the other hand, Mr. Yee's expert witnesses have asserted that the shortfall with respect to 447 Battery Street will amount to $650,000 and with respect to 710 Sansome Street will amount to approximately $350,000.  The principal basis on which confirmation of the Plan of Reorganization is being opposed is that the Plan is not feasible because there will be a shortfall and the Debtor will be unable to fund it.

In order to rebut that contention, Dinesh Maniar, the Debtor's largest shareholder, has placed his home on the market, and agreed to provide up to $1 million from the proceeds of sale to the Debtor to fund the Lease-Up expenses of 447 Battery Street and 710 Sansome Street in return for a general releases of all claims.  A copy of the Loan Commitment is attached to the accompanying Amended Plan of Reorganization as Exhibit A.  The principal terms are as follows:

> $1 million of the proceeds of sale of Mr. Maniar's house will be remitted directly to the Debtor and placed in a segregated interest-bearing account (the "Blocked Account").

> Following confirmation of the Plan of Reorganization, the Debtor may disburse funds from the Blocked Account to fund tenanting expenses associated with 447 Battery or 710 Sansome.

> The Debtor will pay interest monthly at the rate of 2% per annum for funds held in the Blocked Account and 6% per annum for funds disbursed from the Blocked Account.

> The Debtor will repay principal disbursed from the Blocked Account from time to time as it has available funds, but in any event by May of 2013.  Repaying the Loan Commitment has priority over payments to the Debtor's unsecured creditors under the Amended Plan.

> Provided the Plan of Reorganization is confirmed, the Loan Commitment is designed to be completely enforceable.  It is secured by a duly perfected deed of trust against Mr. Maniar's house and Mr. Maniar has consented to the issuance of an Order by the Bankruptcy Court compelling compliance with the Loan Commitment.

> The Debtor understands that Mr. Maniar's house has been listed for sale at $12.8 million.  A deed of trust has been recorded to secure the Loan Commitment.  Encumbrances

senior to the Loan Commitment approximate only $7.5 million, so the Debtor believes that there is no real question about the funding of the Loan Commitment.

A condition of the Loan Commitment is that the Debtor waive all claims against Mr. Maniar. The only claims the Debtor is aware of were disclosed in the prior Disclosure Statement, as follows:

> Although, netted out, Mr. Maniar provided the Debtor with $300 more than he received during the year before bankruptcy, as a result of the timing of the payments he may have received $42,000 in avoidable preferential transfers. Moreover, the Debtor understands the DMRE is a fictitious name used by Mr. Maniar, and it may have received $405,495 in avoidable preferential transfers. Thus, potential preference claims against Mr. Maniar aggregate approximately $450,000.

Mr. Maniar disputes the validity of the potential preference claims and can be expected to defend any action brought to recover on them. In addition, it remains unclear whether the Debtor would enjoy a material recovery from Mr. Maniar, assuming it prevailed in asserting those claims. On balance, the Debtor believes that releasing its claims against Mr. Maniar in order to obtain the benefit of the Loan Commitment is substantially in the best interests of creditors and the estate.

The Debtor believes that the Loan Commitment assures its ability to tenant both properties under any set of circumstances.

## IV.   SETTLEMENT WITH BERKADIA

The Debtor has negotiated a settlement with Berkadia which provides for a consensual disposition of its first deed of trust encumbering the 710 Sansome Street property. A copy of the Berkadia Stipulation is attached to the accompanying Amended Plan of Reorganization as Exhibit B. The settlement becomes effective June 1, 2010. The principal terms of the settlement are as follows:

> ➢ Berkadia's claim will be liquidated as of June 1, 2010, and all principal and interest and attorneys fees and costs (capped at $120,000 actually paid by Berkadia) will be converted into principal.

> ➢ Berkadia's interest rate will be fixed at 6.67%, and Berkadia will receive monthly interest-only payments commencing July 1, 2010.

> ➢ Berkadia will receive payments of $15,000 per month commencing June 1, 2010, reduced to $5,000 per month following February, 2011, credited toward past-due amounts.

> ➢ The Debtor will pay Berkadia a fee of $21,000 not later than June 1, 2010.

> ➢ The obligation to Berkadia will come due on May 31, 2013. The Debtor will have an option to extend the loan an additional two years if (a) it accrues a $21,000 fee, and (b) there is then in place a tenant whose rent amounts to 120% of the monthly debt service and impounds payable to Berkadia in the extension period. During the extension period, debt service will convert from interest-only to payments of interest and principal, the latter based on a 25 year amortization.

> ➢ Upon approval of the settlement and thereafter, all accumulated cash on hand will constitute "free funds" which may be used by the Debtor for any permissible purpose.

> ➢ If the Berkadia Claim is satisfied in cash at the Maturity (or extended Maturity), it shall be discounted by approximately $350,749.52, which represents default interest and late charges accrued through June 1, 2010.

The Debtor believes that the proposed settlement is substantially in the best interests of creditors and the estate.

## IV. TAXES

The Debtor has concluded that a loss of 447 Battery Street would inevitably result in the destruction of any prospect of its reorganization and the elimination of any prospect of recovery to its unsecured creditors due to tax issues.

The Debtor acquired 447 Battery Street through a 1031 exchange, and as a result, the Debtor had a carry-over basis of only $1.2 million. The Debtor provided $2.0 million of cash as part of the purchase price, increasing its basis to approximately $3.2 million. Although there may have been subsequent

adjustments to basis; e.g., as a result of depreciation, $3.2 million is a reasonable approximation of its tax basis in 447 Battery Street.

Mr. Yee has filed an appraisal which values the property at $5.4 million. Assuming the accuracy of that valuation, if Mr. Yee was permitted to foreclose, the foreclosure would be treated as a transfer at $5.4 million, resulting in the realization of $3.2 million of taxable gain ($5.4 million disposition of value less $3.2 million basis). On a stand-alone basis, the tax associated with this gain would be approximately $1 million (10% state capital gain tax and 30% federal income tax.) Obviously, some of these variables are subject to variance; e.g., the estimated value of the property; and there are numerous other issues that affect the Debtor's taxes, including its prior tax history and the tax attributes of its other properties. Nonetheless, the Debtor believes that the foregoing analysis is generally accurate and that foreclosure of 447 Battery will result in the creation of a very substantial tax obligation, an obligation which cannot likely be funded and would likely "swamp" the bankruptcy case.

## V.    CHANGES IN PLAN TREATMENT

### A.    *Summary of the Business Terms of the Reorganization*

The formal treatment of four classes of creditors have been changed in the Amended Plan of Reorganization. Additionally, the practical treatment of the unsecured creditor classes warrants further disclosure.

1.    Class 710-B:

The Note secured by a first Deed of Trust encumbering 710 Sansome, currently held by Berkadia is the sole member of Class 710-B. It will receive the treatment contemplated by the Settlement Agreement discussed in Section III, above.

2.    Class 710-C:

The holders of fractional interests in the Note secured by a second Deed of Trust encumbering 710 Sansome, currently serviced by California Mortgage & Realty Trust ("710 CMR") are the members of Class 710-C. The holders of the Class 710-C claim will accrue interest at the rate of 10% but will

receive monthly payments at the rate of $2,500 per month.  The Class 710-C claim shall become fully due and payable on May 31, 2013.  In the event that (a) the Debtor exercises the two year extension provision respecting the 710-B claim, the Class 710-C Claim shall be extended for a like period.  The Debtor may Debtor refinance 710 Sansome in order to satisfy the Class 710-B claim, in which event the Class 710-C Claim shall subordinate to the refinance, provided that it receives any net cash generated by such refinance.  Upon a refinance which satisfies the Class 710-B Notice, the maturity of the Class 710-B claim shall be extended to May 31, 2015.

3.    <u>Class 447-B:</u>

The Note secured by a first Deed of Trust encumbering 447 Battery, currently held by John Yee is the sole member of Class 447-B.  It will receive the treatment contemplated by the prior Plan of Reorganization, except (a) it shall retain its existing Note and Deed of Trust, but (b) it shall be permitted to exercise its "due on sale" rights only if the Debtor conveys more the 75% of the beneficial ownership interest in the 447 Battery to an unrelated third party.

4.    <u>Class GO-B</u>

Promptly after the Confirmation Date,  the Debtor will quitclaim the Glen Oaks Apartments to the holder of the Class GO-B Claim.  The Debtor will reasonably cooperate in effecting an orderly transition of ownership of the property.

5.    <u>Class PRI</u>

All holders of unsecured claims entitled to statutory priority under the Bankruptcy Code are subject to treatment in Class PRI.  Timely filed Proofs of Claim asserting priority are as follows:

| | |
|---|---|
| Travis County (Real Property Taxes) | $ 196,500.00 |
| Comptroller (Texas Wage Related Taxes) | $ 8,098.00 |
| Franchise Tax Board | $ 250.00 |
| IRS | $ 200.00 |
| Total | $ 205,048.00 |

Without waiving claims or defenses, the Debtor assumes the foregoing claim amounts are accurate. In the case of Travis County, however, the same obligation is secured by a first priority tax lien encumbering the Glen Oaks Apartments. The Debtor believes that obligation will inevitably be satisfied by the owner of the Glen Oaks Apartments.

Under the Plan, priority tax claims will be paid in full, with post-petition interest accrued at the rate contemplated by the underlying taxing authority, as rapidly as possible *after* the Travis County tax has been satisfied by the owner of the property, or on June 1, 2015, if the obligation to Travis County remains outstanding on that date.

### 6. Unsecured Creditors

A table setting forth timely unsecured claims is attached as an Exhibit to this Disclosure Statement. The treatment of unsecured creditors remains as contemplated by the prior Plan of Reorganization, however, consistent with the discussion above, no distributions will be made to unsecured creditors until after both 710 Sansome Street and 447 Battery Street have been successfully Leased-Up. Thereafter, distributions shall be made first to creditors who elect to receive 25% of their allowed unsecured claim in full satisfaction (by electing "early discounted payment" treatment) and thereafter to all other unsecured creditors, until they have received payment in full.

# X.    CONCLUSION

The Debtor believes that approval of the Amended Plan is substantially in the best interest of creditors and the estate, and urges creditors to vote to accept the Plan.

DATED:        May 10, 2010                    MONTGOMERY REALTY GROUP, INC.


By:    /s/   *James Graeb*        .
                James R. Graeb
Responsible Individual


Presented by:

ST. JAMES LAW, P.C.
McNUTT LAW GROUP, LLP


By:     /s/   *Michael St. James*    .
                Michael St. James
Counsel for the Debtor

**EXHIBIT**

**Table of Unsecured Creditors**

|  |  |  | Note |
|---|---|---:|---|
| Austin Energy | $ | 73,917.00 | |
| Bartko Zankel | $ | 7,222.00 | |
| Bruce Hardesty | $ | 7,565.00 | |
| CT Corp fbo Alan D. Budman | $ | 595.00 | |
| Call Insights | $ | 889.00 | |
| Coast to Coast Solutions | $ | 242.00 | |
| Fritz Byrne Head & Harrison | $ | 9,231.00 | |
| Interline Brands | $ | 17,230.00 | |
| JE Brown | $ | 360.00 | |
| PKF CPAs | $ | 78,229.00 | |
| Pacific Bell | $ | 319.00 | |
| Pacific Bell | $ | 902.00 | |
| PG&E | $ | - | |
| SFPUC -- Water Dept | $ | 12,769.00 | Disputed – different property |
| Tenant Tracker | $ | 223.00 | |
| Sherwin Williams Co. | $ | 1,388.00 | |
| Warren Law Firm | $ | 16,916.00 | |
| | | | |
| Total Unsecured | $ | 227,997.00 | |